UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RODNEY HENRY                              CIVIL ACTION

VERSUS                                    NO: 15-5971

NEW ORLEANS LOUISIANA                     SECTION: "J"(2)
SAINTS L.L.C. ET AL.

<u>**ORDER & REASONS**</u>

Before the Court is a *Motion to Compel Arbitration* **(Rec. Doc. 5)** and *Motion to Dismiss or, in the Alternative, to Stay Action Pending Arbitration, and Motion to Compel Arbitration* **(Rec. Doc. 12)** filed by Defendants, New Orleans Louisiana Saints LLC, Tom Benson, and Gayle Benson; an opposition thereto (Rec. Doc. 17) filed by Plaintiff, Rodney Henry; and Defendants' reply (Rec. Doc. 27). Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that the motions should be **GRANTED**.

Also before the Court is a related *Motion to Strike Declaration of Prof. Imre Stephen Szalai* **(Rec. Doc. 23)** filed by Defendants, and Plaintiff's opposition thereto (Rec. Doc. 30). Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **GRANTED**.

Lastly, before the Court is a related *Motion for Limited Discovery* **(Rec. Doc. 31)** filed by Plaintiff, and Defendants'

opposition thereto (Rec. Doc. 34). Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **DENIED**.

## FACTS AND PROCEDURAL BACKGROUND

This litigation arises out of Plaintiff Rodney Henry's employment and subsequent termination of employment with Defendant New Orleans Louisiana Saints LLC ("Saints"). Plaintiff began working for the Saints as a personal assistant to the owner, Tom Benson, approximately twenty-five years ago. Plaintiff resigned from his position for a period of time after Hurricane Katrina but later returned in July 2010. Following his return, Plaintiff was employed again as Mr. Benson's personal assistant until his termination on or about June 24, 2015.

Plaintiff asserts causes of action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.;* the Louisiana Wage Payment Act, La. Rev. Stat. § 23:631 *et seq.;* and Louisiana state law for unpaid wages. (Rec. Doc. 7, at 1.) Plaintiff claims that Defendants violated the FLSA by willfully failing to pay him overtime wages and failing to maintain accurate records of the number of hours he worked per week. *Id.* at 3, 7. According to Plaintiff, while he was employed as Mr. Benson's personal assistant he was paid a salary and a bonus but not overtime. *Id.* at 3.

Further, Plaintiff claims that the Saints terminated him without paying the two-year termination fee owed to him by

2

contract. Plaintiff alleges that he entered into an agreement ("Employment Agreement") in January 2014, whereby Mr. Benson personally reserved the right to terminate Plaintiff without having to pay a two-year termination fee. *Id.* Under the Employment Agreement, if anyone other than Mr. Benson himself terminated Plaintiff during Mr. Benson's lifetime, then the Saints must pay Plaintiff an amount equal to two times his previous year's gross salary. *Id.* at 8. Plaintiff alleges that the Saints breached the Employment Agreement, because Mr. Benson did not personally terminate Plaintiff's employment and the Saints did not pay him the two-year termination fee. *Id.*

In addition, Plaintiff asserts claims of discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; and the Louisiana Employment Discrimination Law ("LEDL"), La. Rev. Stat. § 23:301 *et seq. Id.* at 1. Plaintiff alleges that Mr. Benson's wife, Gayle Benson, harassed him, made racially derogatory comments to him and about him, and engaged in other disrespectful behavior. *Id.* at 8. According to Plaintiff, he reported Mrs. Benson's discriminatory behavior to the Saints but never heard back from anyone regarding his concerns. *Id.* at 9. Plaintiff claims that the Saints began reducing his job duties after he reported the discrimination and that he was ostracized at work. *Id.* at 10. Furthermore, Plaintiff alleges that he provided

testimony in a lawsuit involving the Benson family, which ultimately led to Mrs. Benson and the Saints abruptly terminating his employment as soon as the judge in that matter issued his decision. *Id.* at 10-11.

Plaintiff initially filed this lawsuit against the Saints on November 17, 2015, claiming only that he was improperly denied overtime and that the Saints breached the Employment Agreement. (Rec. Doc. 1.) On January 15, 2016, in response to the original Complaint, the Saints filed the *Motion to Compel Arbitration* **(Rec. Doc. 5)**, arguing that Plaintiff is required to submit his claims to arbitration pursuant to the agreement Plaintiff signed in connection with his most recent employment with the Saints. Three days later, Plaintiff filed the Amended Complaint, wherein he added Tom and Gayle Benson as defendants, and added the claims of employment discrimination and retaliation.[1] (Rec. Doc. 7.)

Shortly thereafter, in response to the Amended Complaint, Defendants filed the *Motion to Dismiss or, in the Alternative, to Stay Action Pending Arbitration, and Motion to Compel Arbitration* **(Rec. Doc. 12)**. Plaintiff filed an opposition to the motions on

---

[1] The Amended Complaint asserts the following nine causes of action: (1) claims for FLSA violations against all Defendants; (2) claims for breach of contract against the Saints; (3) claims for discrimination under Title VII against the Saints; (4) claims for discrimination under LEDL against the Saints; (5) claims for retaliation under Title VII against the Saints; (6) claims for retaliation under LEDL against the Saints; (7) claims for discrimination under § 1981 against the Saints and Gayle Benson; (8) claims for retaliation under § 1981 against the Saints and Gayle Benson; and (9) claims under the Louisiana Wage Payment Act against the Saints. (Rec. Doc. 7, at 11-16.)

March 1, 2016. The Court granted Defendants leave to file a reply on March 7, 2016. Defendants then filed their *Motion to Strike Declaration of Prof. Imre Stephen Szalai* **(Rec. Doc. 23)**, seeking to strike an exhibit attached to Plaintiff's opposition to the motions to compel. After a brief continuance to permit the parties to participate in a settlement conference, Plaintiff opposed the motion to strike on April 26, 2016. That same day, Plaintiff filed his *Motion for Limited Discovery* **(Rec. Doc. 31)**, which Defendants opposed on May 9, 2016. The motions are now before the Court on the briefs.

## <u>LEGAL STANDARD</u>

"In enacting the Federal Arbitration Act, Congress declared a national policy in favor of arbitration." *Snap-on Tools Corp. v. Mason*, 18 F.3d 1261, 1263 (5th Cir. 1994) (citing *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984)). Section 2 of the Federal Arbitration Act ("FAA") provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract." 9 U.S.C. § 2. Congress has therefore mandated the enforcement of valid arbitration agreements.

5

Considered to be "the primary substantive provision of the Act," § 2 reflects "a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). In effect, § 2 creates "a body of federal substantive law of arbitrability." *Id.* "[C]ongress' clear intent, in the Arbitration Act, [was] to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Snap-on Tools*, 18 F.3d at 1263 (alterations in original) (quoting *Moses H. Cone Mem. Hosp.*, 460 U.S. at 22). Thus, there is a strong presumption in favor of arbitration.

The FAA requires district courts to "compel arbitration of otherwise arbitrable claims, when a motion to compel arbitration is made." *Sedco, Inc. v. Petroleos Mexicanos Mexican Nat'l Oil Co.*, 767 F.2d 1140, 1147 n.20 (5th Cir. 1985). Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under the agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. This provision is mandatory and demands a stay of the proceedings, at the request of a party, if the dispute is

6

arbitrable and referred to arbitration. *Tittle v. Enron Corp.*, 463 F.3d 410, 417 n.6 (5th Cir. 2006). When all of the issues raised in the case are referable to arbitration, courts may dismiss, rather than stay, the case. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992). However, under those circumstances, dismissal is within the court's discretion; it is not required. *Apache Bohai Corp., LDC v. Texaco China, B.V.*, 330 F.3d 307, 311 n.9 (5th Cir. 2003).

Courts employ a two-step analysis to determine whether a party may be compelled to arbitrate. *Jones v. Halliburton Co.*, 583 F.3d 228, 233 (5th Cir. 2009). The Court first inquires whether the party has agreed to arbitrate the dispute at issue. *Id.* at 233-34. This question itself is further subdivided into two considerations: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257-58 (5th Cir. 1996). To determine whether the parties formed a valid agreement to arbitrate, the Court applies ordinary principles of state contract law. *Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 537-38 (5th Cir. 2003). "[T]he federal policy favoring arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Id.* at 538. In analyzing arbitrability, courts apply federal substantive law. *Grigson v.*

7

*Creative Artists Agency, LLC*, 210 F.3d 524, 531 (5th Cir. 2000). Thus, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25. If the Court finds that there is a valid agreement to arbitrate between the parties and that the dispute in question falls within the scope of the arbitration agreement, the second step is to determine whether any federal statute or policy renders the claims nonarbitrable. *Wash. Mut. Fin. Grp. v. Bailey*, 364 F.3d 260, 263 (5th Cir. 2004).

**PARTIES' ARGUMENTS AND DISCUSSION**

**A.   Motion to Strike Declaration of Professor Szalai**

Defendants seek to strike the declaration of Professor Imre Stephen Szalai, a law professor at Loyola University New Orleans College of Law and a leading scholar in the field of arbitration. Plaintiff included Professor Szalai's declaration with his opposition to the motions to compel arbitration. (Rec. Doc. 17-3.) Defendants' motion to strike affects the scope of the record that is to be considered in deciding the motions to compel arbitration. Accordingly, the Court will address the motion to strike before discussing the motions to compel arbitration.

Defendants assert that Professor Szalai's declaration is improper, irrelevant, unreliable, and inadmissible, and therefore

8

should be stricken from the record and disregarded by the Court when ruling on Defendants' pending motions to compel arbitration. (Rec. Doc. 23-1, at 2.) First, Defendants argue that the declaration improperly states legal opinions and conclusions of law. *Id.* Next, Defendants argue that Professor Szalai's opinions are based on erroneous facts and amount to speculation. *Id.* at 3. Finally, to the extent Professor Szalai is attempting to provide lay opinions, Defendants argue that his declaration is inadmissible because it is not based on personal knowledge of the underlying facts. *Id.* at 4.

In response, Plaintiff claims that Professor Szalai's declaration does not consist of legal conclusions but rather "norms, protocols, and industry standards within the field of employment arbitration." (Rec. Doc. 30, at 1.) Furthermore, Plaintiff argues that there is sufficient foundation to support the declaration because Professor Szalai has reviewed all of the evidence in the record. *Id.* at 2.

One method of attacking evidence offered to support or oppose a motion is by a motion to strike that contains specific objections to its admissibility. *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 506 (5th Cir. 1999), *superseded on other grounds by* Fed. R. Evid. 103(a); *see also* Fed. R. Civ. P. 56(c)(2) (providing that a party may simply object to the admissibility of material used to

support or oppose a motion; there is no need to make a separate motion to strike).

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert may testify if (1) the expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the expert's testimony is based on sufficient facts or data; (3) the expert's testimony is the product of reliable principles and methods; and (4) the principles and methods employed by the expert have been reliably applied to the facts of the case. Fed. R. Evid. 702. Thus, in order to be admissible, expert testimony must be reliable and must be able to help the trier of fact to understand the evidence or to determine a fact in issue.

An opinion is not objectionable "just because it embraces an ultimate issue." Fed. R. Evid. 704. Rule 704 was enacted to change the old view that a witness giving an opinion on an ultimate issue would "usurp the function" or "invade the province" of the jury. *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). However, Rule 704 "does not open the door to all opinions" and it is not "intended to allow a witness to give legal conclusions." *Id.* An expert's legal conclusion "both invades the court's province and is irrelevant." *Id.; see also Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) ("Expert testimony that consists of legal conclusions cannot properly

assist the trier of fact."). Therefore, "an expert may never render conclusions of law." *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009); *see also Woodard v. Andrus*, No. 03-2098, 2009 WL 140527, at *2 (W.D. La. Jan. 20, 2009) (excluding expert opinion of law professor as to whether the legal standard for class certification had been satisfied).

The Court has reviewed Professor Szalai's declaration and finds that his proffered testimony is focused on the interpretation and enforceability of the arbitration agreement at issue in this case. The interpretation of an arbitration agreement, and whether the agreement bound the parties to arbitrate, is a question of law. *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 353 (5th Cir. 2003). The enforceability of an arbitration clause is also a question of law. *Mitsui & Co. (USA) v. Mira M/V*, 111 F.3d 33, 35 (5th Cir. 1997). In the declaration, Professor Szalai opines that the agreement "fails to provide each party with a meaningful opportunity to select an arbitrator, and as a result, [it] lacks fundamental fairness." (Rec. Doc. 17-3, at 3.) Further, Professor Szalai states that the agreement is "also problematic because it appears to waive substantive rights." *Id.* The declaration does not offer any opinion as to what the underlying facts are, nor does it otherwise attempt to help the Court "understand the evidence." Fed. R. Evid. 702. For these reasons, the Court finds that Professor Szalai's testimony, as reflected in his declaration,

11

renders legal conclusions regarding the interpretation and enforceability of the arbitration agreement.

Accordingly, the Court will disregard Professor Szalai's declaration in deciding Defendants' motions to compel arbitration. It bears emphasis that the Court is not excluding Professor Szalai's declaration on the ground that he is unqualified or that his testimony is unreliable.

**B.   Motions to Compel Arbitration and Dismiss or Stay Action Pending Arbitration**

Defendants contend that Plaintiff is required to submit all of his claims to arbitration. In connection with his most recent employment with the Saints, Plaintiff signed an agreement ("the Agreement") on July 24, 2010. (Rec. Doc. 5-2, at 2.) The Agreement provides, in relevant part, as follows:

> In consideration of my employment by the New Orleans
> Louisiana Saints Football Club, hereinafter "the Club",
> I hereby agree to comply at all times with and be legally
> bound by the Constitution and Bylaws of the National
> Football League ("NFL"), in their present form and as
> amended from time to time hereafter; by NFL policies,
> rules and regulations applicable to the member clubs, in
> their present form and as amended from time to time
> hereafter; and by the decisions of the NFL Commissioner.
> *I agree that all matters in dispute between myself and
> the Club shall be referred to the Commissioner for
> binding arbitration*, and his decision shall be accepted
> as final, conclusive and unappealable by me and the Club.

*Id.* (emphasis added). Defendants argue that the arbitration agreement is valid and enforceable, and that all of Plaintiff's claims asserted in the Amended Complaint, including those asserted

against Tom and Gayle Benson, fall within the scope of the arbitration agreement.

### 1. Plaintiff Must Submit His Claims Against the Saints to Arbitration

The Court must first apply ordinary principles of state contract law to determine whether there is a valid agreement to arbitrate between Plaintiff and the Saints. Under Louisiana law, "[a] contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906. Four elements are required for a valid contract: (1) capacity to contract; (2) mutual consent; (3) a lawful cause; (4) and an object that is lawful, possible, and determined or determinable. *Granger v. Christus Health Cent. La.*, 144 So. 3d 736, 760-61 (La. 2013); *see also* La. Civ. Code arts. 1918, 1927, 1966, 1971. The party claiming the existence of a contract has the burden of proving that the contract was perfected. La. Civ. Code art. 1831.

Here, the written agreement to arbitrate is valid and enforceable. First, the parties to the agreement had capacity to contract. Louisiana law presumes that all persons have capacity to contract, except unemancipated minors, interdicts, and persons deprived of reason at the time of contracting. La. Civ. Code art. 1918. In this case, it is undisputed that Plaintiff and the Saints had capacity to contract. Second, there is also no dispute that

the Agreement concerned a lawful cause. "Cause is the reason why a party obligates himself." *Id.* art. 1967. Here, Plaintiff entered into the Agreement "in consideration of [his] employment." (Rec. Doc. 5-2, at 2.) "Employment [is a] valid cause of [a] contract." *Cellular One, Inc. v. Boyd*, 653 So. 2d 30, 34 (La. App. 1 Cir. 1995). Third, neither Plaintiff nor Defendants dispute the legality of the contractual object. The objects of a contract are the specific actions the parties must undertake to comply with the contract. *See* La. Civ. Code art. 1971. Louisiana law favors arbitration. *Aguillard v. Auction Mgmt. Corp.*, 908 So. 2d 1, 7 (La. 2005). Thus, the act of submitting disputes to arbitration is a valid contractual object.

There is also evidence of mutual consent. Under Louisiana law, mutual consent is established through offer and acceptance. La. Civ. Code art. 1927. Louisiana law does not require that the written arbitration agreement be signed by the parties. *Marino v. Dillard's, Inc.*, 413 F.3d 530, 532 (5th Cir. 2005) (citing *Hurley v. Fox*, 520 So. 2d 467, 467 (La. App. 4 Cir. 1988)). Here, the Saints presented the Agreement to Plaintiff along with several other documents when Plaintiff returned to employment in July 2010. Plaintiff signed the Agreement on July 24, 2010, and began working for the Saints as Mr. Benson's personal assistant. Furthermore, Laura Russett, a representative of the Saints, signed the Agreement on July 26, 2010. The parties' signatures and Plaintiff's continued

14

employment after receiving the Agreement evidence mutual consent
to the arbitration clause in the Agreement.

Although it appears that an agreement to arbitrate existed
between Plaintiff and the Saints, Plaintiff argues that the
Agreement is not valid and enforceable for several reasons. The
argument that an arbitration agreement is unconscionable or
otherwise unenforceable requires consideration of both federal and
state law. *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*,
379 F.3d 159, 166 (5th Cir. 2004). As a matter of federal law,
"arbitration agreements and clauses are to be enforced *unless* they
are invalid under principles of state law that govern all
contracts." *Id.* Therefore, "generally applicable contract
defenses, such as fraud, duress, *or unconscionability,* may be
applied to invalidate arbitration agreements without contravening
§ 2." *Id.* (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S.
681, 687 (1996)).

Under Louisiana law, a presumption of arbitrability exists
regarding the determination of the enforceability of arbitration
agreements. *Aguillard v. Auction Mgmt. Corp.*, 908 So. 2d 1, 18
(La. 2005). In determining whether an arbitration clause is
adhesionary and unenforceable, Louisiana courts consider four
factors: (1) the physical characteristics of the arbitration
clause; (2) the distinguishing features of the arbitration clause;
(3) the mutuality of the arbitration clause, in terms of the

15

relative burdens and advantages conferred by the clause upon each party; and (4) the relative bargaining strength of the parties. *Id.* at 16-17.

First, Plaintiff argues that the Agreement is unenforceable because it lacks mutuality. In determining whether an arbitration provision lacks mutuality, Louisiana courts consider whether the arbitration provision limits the rights of both parties to litigate. *Hanlon v. Monsanto Ag Prods., LLC*, 124 So. 3d 535, 543 (La. App. 2 Cir. 2013). According to Plaintiff, the language of the Agreement requires Plaintiff to agree to arbitration but does not include any corresponding language reflecting Defendants' agreement to do the same. However, Plaintiff's argument is refuted by the plain language of the Agreement, which unambiguously states that "all matters in dispute between [Plaintiff] and the [Saints] shall be referred to the Commissioner for binding arbitration, and his decision shall be accepted as final . . . by [Plaintiff] and the [Saints]." (Rec. Doc. 5-2, at 2.) As mentioned above, both Plaintiff and a representative of the Saints signed the Agreement. Therefore, Plaintiff and the Saints mutually agreed to submit their disputes to arbitration.

Plaintiff also argues that the Agreement lacks mutuality because the Saints retained the right to bring certain claims to court in a separate agreement ("Confidentiality Agreement") between Plaintiff and the Saints. This argument also lacks merit.

16

The Confidentiality Agreement requires Plaintiff to maintain the confidential nature of certain information Plaintiff may learn during the course of his employment. (Rec. Doc. 17-1, at 20.) In relevant part, it states that "the Saints shall be entitled to take legal action to recover damages sustained as a result of [Plaintiff's] failure to abide with the terms of [the Confidentiality Agreement]." *Id.* Further, it provides that the Saints are entitled to an immediate injunction prohibiting Plaintiff from further violating the provisions of the agreement. *Id.* Contrary to Plaintiff's argument, the Confidentiality Agreement does not give the Saints "the right to bring certain claims to court." The Confidentiality Agreement makes no mention of a court of law; it does not specify a forum for such legal action.

The Agreement does not lack mutuality because the Saints reserved the right to seek an injunction. Although the FAA establishes a strong presumption in favor of arbitration and limits the role of the court to determining whether a particular claim is referable to arbitration, "the Fifth Circuit has also very clearly stated that when the issue of arbitrability has not yet been decided, the district court has the authority to grant preliminary injunctive relief." *WPC III, Inc. v. Benetech, L.L.C.*, No. 11-2920, 2012 WL 3253186, at *2 (E.D. La. Aug. 7, 2012) (citing *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)). "The majority of

17

courts in the country follow this view, holding that a district court has authority to grant provisional relief in the face of arbitration." *Id.* (collecting cases). Thus, the Confidentiality Agreement can be read in harmony with the Agreement, which requires that "all matters in dispute" be referred to arbitration. Even if the Agreement lacked mutuality, "[t]he lack of mutuality, alone, does not mandate a finding that the arbitration provision is adhesionary and unenforceable." *Hanlon*, 124 So. 3d at 543.

Second, Plaintiff argues that the Agreement is invalid because it requires him to waive future substantive legal rights. In *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, the Supreme Court addressed a district court's enforcement of an agreement to arbitrate, which forced an auto dealer to arbitrate its antitrust claims under the Sherman Act in Japan. 473 U.S. 614, 619-21 (1985). In dicta, the Supreme Court expressed a willingness to invalidate, on "public policy" grounds, arbitration agreements that operate "as a prospective waiver of a party's right to pursue statutory remedies." *Id.* at 637 n.19. This prospective-waiver doctrine applies if a provision in an arbitration agreement forbids the assertion of certain statutory rights. *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013). However, the Court in *Mitsubishi* declined to apply the doctrine, in part, because it would be premature to do so; the case addressed the enforceability of an agreement to arbitrate, as opposed to an award

18

in which the arbitrator actually failed to address causes of action under American statutes. *See Asignacion v. Rickmers Genoa Schiffahrtsgesellschaft mbH & Cie KG*, 783 F.3d 1010, 1021 (5th Cir. 2015) (citing *Mitsubishi*, 473 U.S. at 637 n.19). The burden of showing that an arbitration clause is incompatible with statutory rights is on the party seeking to avoid arbitration. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

Here, Plaintiff argues that the Agreement is invalid because it contains the following clause wherein Plaintiff agreed to waive all claims relating to a decision of the NFL Commissioner that affects him:

> I further agree to release and discharge the Commissioner, the NFL and any league in which the Club may hereafter become a member, each of its subsidiaries, affiliates and member clubs, and each of their respective owners, directors, stockholders, partners, officers, employees, agents and holders of an interest therein, and all of them, in their individual and representative capacities, from any and all claims, demands, suits, losses, damages, liabilities, actions and/or causes of action arising out of, relating to or in any way connected with any decision of the Commissioner (whether in connection with a dispute involving me and the Club or otherwise) that involves or in any way affects me, except to the extent of awards made to me by the Commissioner.

(Rec. Doc. 17-1, at 19.) Plaintiff argues that, under that provision, he would have no cause of action against the Saints if, for example, one of its employment decisions violated Title VII, if the Commissioner had some role in the decision making process. In response, Defendants argue that the clause is simply designed

19

to prevent Plaintiff from suing the arbitrator, the NFL, or the member clubs in the event that Plaintiff disagrees with the arbitrator's ultimate decision.

To the extent that the waiver provision can be interpreted to prevent Plaintiff from effectively vindicating his rights under Title VII, it is unenforceable. "[T]here can be no prospective waiver of an employee's rights under Title VII." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974). However, when considering whether contractual provisions operate as substantive waivers of statutory rights, the Supreme Court has demonstrated "hesitation to invalidate arbitration agreements on the basis of speculation." *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 274 (2009).

The Court need not determine whether the waiver provision operates as a prospective waiver of statutory rights because, even assuming that the waiver clause is unlawful, it does not render the arbitration clause void; the arbitration clause may be severed from the remainder of the Agreement. The Supreme Court has rejected the view that state law governs the question of "severability" of an arbitration provision subject to the FAA. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400, 402-03 (1967). The FAA "create[d] a body of federal substantive law," which is "applicable in state and federal courts." *Southland Corp. v. Keating*, 465 U.S. 1, 12 (1984). "[A]s a matter of substantive federal arbitration law, an arbitration provision is severable

20

from the remainder of the contract." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445-46.

Plaintiff argues that the arbitration clause cannot be severed because it is "inexorably entwined" with the waiver clause. The Court disagrees. The purpose of the arbitration provision is to settle any and all disputes between Plaintiff and the Saints in an arbitral forum rather than a court of law. Even with the alleged unlawful prospective waiver clause lifted, the arbitration clause remains capable of achieving this goal. In fact, the severing of such a waiver serves to expand the scope of arbitration rather than reduce or impair it. Because Plaintiff's challenge is to the alleged unlawful waiver clause rather than the arbitration clause, the arbitration clause must be severed. *See Hadnot v. Bay, Ltd.*, 344 F.3d 474, 478 (5th Cir. 2003) (severing unenforceable provision and enforcing remainder of arbitration clause).

The arbitration clause does not prevent Plaintiff from effectively vindicating his statutory rights. An arbitration agreement is a "kind of forum-selection clause." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974). By agreeing to arbitrate a particular cause of action, parties do not forgo any substantive rights but only agree to submit to the jurisdiction of an arbitral,

rather than a judicial, forum. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31-32 (1991). Thus, the agreement to arbitrate does not operate as a prospective waiver of statutory rights.

Third, Plaintiff contends that the Agreement is invalid because it is ambiguous. In particular, Plaintiff argues that the "carve-out" language at the end of the waiver clause, which excludes from the waiver certain rights with respect to a possible arbitration award, is ambiguous. (Rec. Doc. 17-1, at 19.) As discussed above, the waiver clause requires Plaintiff to release his claims against several parties, including the Saints and the NFL Commissioner, related to any decision of the Commissioner that affects Plaintiff, "*except to the extent of awards made to* [Plaintiff] *by the Commissioner.*" *Id.* (emphasis added). Plaintiff argues that the carve-out language excluding claims related to arbitration awards from the waiver clause is directly at odds with language in the arbitration clause stating that an arbitration award is "unappealable." Defendants claim that the carve-out language clearly provides that Plaintiff does not waive his statutory right to seek judicial review of the arbitrator's decision in court.

The purported ambiguity does not render the Agreement unenforceable. Louisiana caselaw analyzing arbitration agreements demonstrates that "invalidity" includes, yet is not limited to, contracts that contain provisions that are unconscionable or

possess features of both adhesionary formation and unduly harsh
substances. *See Iberia Credit*, 379 F.3d at 166-67. Plaintiff
presents no support for the proposition that ambiguous language
necessitates finding that the arbitration clause is unenforceable
or invalid. *See Baudoin v. Mid-La. Anesthesia Consultants, Inc.*,
306 F. App'x 188, 195 (5th Cir. 2009) (finding no support for the
proposition that ambiguous language rendered the arbitration
provision unenforceable or invalid, and concluding that the
"attempts to allege invalidity, from language that is at most
ambiguous, must fail"). As a general rule of construction,
"ambiguously worded contracts should not be interpreted to render
them illegal and unenforceable where the wording lends itself to
a logically acceptable construction that renders them legal and
enforceable." *Walsh v. Schlecht*, 429 U.S. 401, 408 (1977).
Defendants correctly point out that the FAA allows a court to
vacate an arbitration award for certain reasons upon the
application of any party to the arbitration. *See* 9 U.S.C. § 10(a).
To the extent that the language in the arbitration clause stating
that the arbitrator's decision is "unappealable" precludes
judicial review, that portion of the clause is severable for the
reasons discussed above. *See Hadnot*, 344 F.3d at 478 (severing
unenforceable provision in arbitration clause barring any award of
punitive damages and upholding remainder of arbitration clause

that authorized arbitration of all disputes arising out of employment relationship).

Fourth, Plaintiff argues that the Agreement is unconscionable because it designates the NFL Commissioner, who is an employee of the Saints and alleged to be a personal friend of the Bensons, as the sole arbitrator with final binding authority. The FAA protects against bias by providing that courts may overturn arbitration decisions "[w]here there was evident partiality or corruption in the arbitrators." 9 U.S.C. § 10(b). Even where arbitrator bias is at issue, the FAA does not provide for removal of an arbitrator from service prior to an award, but only for potential vacatur of any award. *Gulf Guar. Life Ins. Co. v. Conn. Gen. Life Ins. Co.*, 304 F.3d 476, 490 (5th Cir. 2002).

"[I]t is well established that prior to issuance of an award, a court may not make inquiry into an arbitrator's capacity to serve based on a challenge that a given arbitrator is biased." *Id.* (citing *Aviall, Inc. v. Ryder Sys., Inc.*, 110 F.3d 892, 895 (2d Cir. 1997)). Thus, "an agreement to arbitrate before a particular arbitrator may not be disturbed, unless the agreement is subject to attack under general contract principles," that is, unless "the arbitrator's relationship to one party was undisclosed, or unanticipated and unintended, thereby invalidating the contract." *Aviall*, 110 F.3d at 895-96. There has been no showing in this case that the Commissioner's relationship to Defendants was

24

undisclosed,   unanticipated,   or   unintended.   Therefore   the
appropriate method for contesting any possible bias is through
judicial review of the arbitration award.

Fifth, Plaintiff argues that the NFL's Dispute Resolution
Procedural Guidelines ("Guidelines") are inapplicable because they
were not adequately referenced in the Agreement and that they
contain unconscionable rules that are in derogation of his
statutory rights. For example, Plaintiff claims that the
Guidelines deprive him of his statutory right to recover his costs
should he prevail on his claims under Title VII, the LEDL, or the
Wage Payment Act. In response, Defendants argue that Plaintiff
cites no legal authority that would have required a specific
reference to the NFL's Guidelines. Furthermore, Defendants contend
that the Guidelines do not permit the arbitrator to deprive
Plaintiff of an award of costs if costs are permitted by law.[2]

Whether the parties must arbitrate according to the NFL's
Guidelines is beyond the scope of the Court's inquiry on a motion
to compel arbitration, which is limited to determining whether a
valid agreement to arbitrate the dispute at issue exists and

---

[2] The NFL's Guidelines set forth a general rule for fees and costs, subject to
any agreement of the parties to the contrary. (Rec. Doc. 5-2, at 8.) Under the
Guidelines, "each party shall pay its own costs and attorneys' fees *to the
fullest extent permitted by law*; provided that the Commissioner will have
authority to award reimbursement of attorney's fees to the prevailing party in
accordance with the applicable law." *Id.* (emphasis added). The rule seems to
permit an award of costs to the extent permitted by law. However, the issue is
likely moot because Defendants have stipulated that the Saints will pay all
costs and fees of the arbitrator and the arbitral forum. (Rec. Doc. 27, at 9
n.10.)

whether any federal statute or policy renders the claims nonarbitrable. *See Jones v. Halliburton Co.*, 583 F.3d 228, 233-34 (5th Cir. 2009). Generally, questions about arbitration procedure should be resolved in the first instance by the arbitrator. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684-85 (2010) ("In certain contexts, it is appropriate to presume that parties that enter into an arbitration agreement implicitly authorize the arbitrator to adopt such procedures as are necessary to give effect to the parties' agreement."); *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 557 (1964) ("Once it is determined . . . that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.").

The Agreement is enforceable regardless of whether the NFL's Guidelines were adequately referenced. The lack of specific terms governing the arbitration's procedure does not invalidate the arbitration agreement. *See Weinberg v. Silber*, 57 F. App'x 211 (5th Cir. 2003) (finding no support for "theory that an agreement to arbitrate *must* include procedural 'ground rules' to govern the proceedings"); *Hudson Specialty Ins. Co. v. N.J. Transit Corp.*, No. 15-89, 2015 WL 3542548, at *7 (S.D.N.Y. June 5, 2015) ("Courts within this circuit have routinely rejected the argument that the procedural rules governing arbitration constitute essential

terms."); *Cajun Contractors, Inc. v. Lafayette Consol. Gov't*, 715 So. 2d 588, 591 (La. App. 3 Cir.) ("There is no statutory requirement that the provisions of an arbitration clause must specifically delineate the procedures for the arbitration process for the arbitration clause to be valid and enforceable."), *rev'd on other grounds*, 723 So. 2d 968 (La. 1998). Ultimately, whether Plaintiff is bound by the Guidelines is beyond the scope of what is at issue here: whether Plaintiff is required to arbitrate his dispute, as opposed to proceeding with his action in federal court. Therefore, this issue is for the arbitrator to decide.

Lastly, as a separate and distinct argument, Plaintiff asserts that the Supreme Court's holding in *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), was wrongly decided and should be overturned. In *Circuit City*, the Supreme Court held that valid arbitration agreements between employers and their employees are fully enforceable under the FAA. *Id.* at 118-19. A district court clearly does not have the authority to overturn any decision by the United States Supreme Court. *See, e.g.*, *Perez v. Stephens*, 745 F.3d 174, 180 (5th Cir. 2014) ("The Supreme Court has sole authority to overrule its own decisions."); *Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1018 (7th Cir. 2002) ("[W]e have no authority to overrule a Supreme Court decision no matter how dubious its reasoning strikes us, or even how out of touch with the Supreme Court's current thinking the decision seems."); *Nat'l*

27

*Foreign Trade Council v. Natsios*, 181 F.3d 38, 58 (1st Cir. 1999) ("Scholarly debate about the continuing viability of a Supreme Court opinion does not, of course, excuse the lower federal courts from applying that opinion."). No further discussion of Plaintiff's argument is necessary.

For the foregoing reasons, the Court finds that there is a valid and enforceable arbitration agreement between Plaintiff and the Saints. The next step is to determine whether the dispute in question falls within the scope of the arbitration provision. When determining whether a dispute is covered by the scope of an arbitration agreement, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *Safer v. Nelson Fin. Grp., Inc.*, 422 F.3d 289, 294 (5th Cir. 2005). In making this determination, the Fifth Circuit distinguishes between broad and narrow arbitration clauses. *See Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754-55 (5th Cir. 1993). Arbitration clauses containing the "all matters in dispute" language, such as the one presently before the Court, are of the broad type. *See id.* at 755. "If the clause is broad, the action should be stayed and the arbitrators permitted to decide whether the dispute falls within the clause." *Id.* at 754. Furthermore, no federal statute or policy renders Plaintiff's claims nonarbitrable. *See Jones*, 583 F.3d at 234. Therefore, the

28

Court will order arbitration, stay this action, and permit the arbitrator to decide whether Plaintiff's claims against the Saints falls within the scope of the arbitration agreement.

### 2.   Plaintiff Must Submit His Claims Against the Bensons to Arbitration

Next, the Court must determine whether Plaintiff must arbitrate his claims against Tom and Gayle Benson in accordance with the arbitration clause in the Agreement. Plaintiff argues that Mr. and Mrs. Benson are not parties to the Agreement and do not have a legal or equitable basis to compel Plaintiff to arbitrate his claims against them. Defendants argue that the Bensons can compel arbitration under principles of equitable estoppel.

The Supreme Court has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement. *Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 631 (2009). The Court explained that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *Id.* (quoting 21 R. Lord, *Williston on Contracts* § 57:19 (4th ed. 2001)).

Under Louisiana law, equitable estoppel is a jurisprudential doctrine generally involving (1) a representation by conduct or work; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. *MB Indus., LLC v. CNA Ins. Co.*, 74 So. 3d 1173, 1180 (La. 2011). In the context of arbitration, Louisiana courts have applied the doctrine of equitable estoppel as stated by the Fifth Circuit in *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524 (5th Cir. 2000),[3] to compel arbitration between a nonsignatory defendant and a signatory plaintiff when the plaintiff raises allegations of substantially interdependent and concerted misconduct by the nonsignatory and one or more of the signatories to the agreement. *See, e.g.*, *Sturdy Built Homes, L.L.C. v. Carl E. Woodward L.L.C.*, 82 So. 3d 473, 478 (La. App. 4 Cir. 2011); *Regions Bank v. Weber*, 53 So. 3d 1284, 1291 (La. App. 4 Cir. 2010); *Saavedra v. Dealmaker Devs., LLC*, 8 So. 3d 758, 763 n.5 (La. App. 4 Cir. 2009). *But cf. Sherwin-Williams Co. v. Culotta*, 2012 WL 1550589, at *4 (La. App. 1 Cir. 2012) (noting in dicta that the court "disagree[d] generally with th[e] doctrine" of equitable estoppel).

---

[3] In *Grigson*, the Fifth Circuit adopted the "intertwined-claims test" of equitable estoppel formulated by the Eleventh Circuit to evaluate whether a nonsignatory could compel arbitration. 210 F.3d at 527–28. Under *Grigson*, application of equitable estoppel is warranted when "the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." *Id.* at 527.

"The linchpin for equitable estoppel is equity—fairness." *Regions Bank*, 53 So. 3d at 1291 (quoting *Grigson*, 210 F.3d at 528). In *Grigson*, the Fifth Circuit noted that "it would be especially inequitable where, as here, a signatory non-defendant is charged with interdependent and concerted misconduct with a non-signatory defendant." 210 F.3d at 528.

> In such instances, that signatory, in essence, becomes a party, with resulting loss, *inter alia*, of time and money because of its required participation in the proceeding. Concomitantly, detrimental reliance by that signatory *cannot* be denied: it and the signatory-plaintiff had agreed to arbitration in lieu of litigation (generally far more costly in terms of time and expense); but, the plaintiff is seeking to avoid that agreement by bringing the action against a non-signatory charged with acting in concert with that non-defendant signatory.

*Id.* That is the situation here, where the Plaintiff agreed to arbitrate with the Saints but is seeking to avoid that agreement by asserting identical claims against the Bensons as well.

Plaintiff relies heavily on *Lakeland Anesthesia, Inc. v. CIGNA Healthcare of LA, Inc.*, 812 So. 2d 695 (La. App. 4 Cir. 2002); however, that case is distinguishable. In *Lakeland Anesthesia*, the plaintiff was a nonsignatory to an arbitration agreement between the defendant, CIGNA Healthcare, and a third party, Columbia/HCA. *Id.* at 697. CIGNA sought to compel the nonsignatory plaintiff to arbitrate its dispute with CIGNA under the doctrine of equitable estoppel, reasoning that all of the plaintiff's claims were based on the agreement between CIGNA and

31

Columbia/HCA. *Id.* at 701. The court rejected this argument, noting that "CIGNA Healthcare [the signatory defendant] has not claimed that [it] has changed its position in justifiable reliance on any voluntary conduct on the part of Lakeland Anesthesia [the nonsignatory plaintiff]." *Id.* Thus, the situation in *Lakeland Anesthesia* was not like the present one where a signatory to a contract requiring arbitration has sued another signatory and several nonsignatories, all of whom seek to compel arbitration. In a situation like the present one, Louisiana courts have compelled arbitration under the doctrine of equitable estoppel. *See Sturdy Built Homes*, 82 So. 3d at 478 (applying the doctrine of equitable estoppel to compel a signatory plaintiff to arbitrate with a nonsignatory defendant); *Regions Bank*, 53 So. 3d at 1291 (same); *Saavedra*, 8 So. 3d at 763 n.5 (same).

As this Court has previously held, where a signatory plaintiff (i.e., Rodney Henry) asserts claims against nonsignatory defendants (i.e., the Bensons) that require the signatory defendant (i.e., the Saints) to, "in essence, become[] a party, with resulting loss . . . of time and money because of its required participation on the proceeding," the plaintiff may not avoid the arbitration agreement. *See In re Apple iPhone 3G & 3GS MMS Mktg. & Sales Practices Litig.*, 864 F. Supp. 2d 451, 465 (E.D. La. 2012). To hold otherwise would run afoul of the liberal federal policy favoring arbitration and would render the arbitration proceeding

32

between the signatory plaintiff and the signatory defendant meaningless. *Id.*

Here, if Plaintiff is permitted to proceed with his claims against the Bensons in court, the Saints would, in essence, become a party to the litigation because Plaintiff alleges substantially interdependent and concerted misconduct by Tom Benson, Gayle Benson, and the Saints. Furthermore, all of Plaintiff's claims stem from his employment. The only cause of action Plaintiff asserts against Tom Benson is the FLSA claim, which Plaintiff asserts collectively against all Defendants. Plaintiff alleges that each Defendant—Tom Benson, Gayle Benson, and the Saints—was his "employer" under the FLSA. Therefore, Plaintiff's FLSA claims against Tom and Gayle Benson are based on the same operative facts and are inherently inseparable from the FLSA claim against the Saints. To not apply the intertwined-claim basis to compel arbitration of Plaintiff's FLSA claims against the Bensons "would fly in the face of fairness." *Sturdy Built Homes*, 82 So. 3d at 478 (quoting *Grigson*, 210 F.3d at 528).

Similarly, Plaintiff's remaining two claims against Gayle Benson, claims for discrimination and retaliation under 42 U.S.C. § 1981, are asserted collectively against Mrs. Benson and the Saints. Moreover, these claims are indistinguishable from Plaintiff's claims against the Saints for discrimination and relation under Title VII. The analysis of employment

33

discrimination and retaliation claims under Title VII and § 1981
is "identical." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987,
992 (5th Cir. 2005); *accord Willis v. Cleco Corp.*, 749 F.3d 314,
317 (5th Cir. 2014) ("The legal framework governing [Title VII and
§ 1981] claims is coextensive."); *Raggs v. Miss. Power & Light
Co.*, 278 F.3d 463, 468 (5th Cir. 2002) ("[The Fifth Circuit]
considers claims of intentional discrimination, which include
racial discrimination and retaliation claims based on Title VII
and 42 U.S.C. § 1981, under the same rubric of analysis.") *see
also CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 455 (2008)
(recognizing a "necessary overlap" between Title VII and § 1981).

Given the relatedness of the claims collectively asserted
against the Defendants, the arbitration agreement can be invoked
by all Defendants, including the Bensons. Otherwise the
arbitration proceedings between Plaintiff and the Saints would be
rendered meaningless and the federal policy in favor of arbitration
effectively thwarted. *See Grigson*, 210 F.3d at 527.[4] Therefore,

---

[4] Because the intertwined-claims test incorporates an element of detrimental
reliance, *see Grigson*, 210 F.3d at 528, the result is no different if the Court
applies the intertwined-claims test or the general three-part test for equitable
estoppel under Louisiana law. Plaintiff voluntarily represented his assent to
arbitrate. There can be little doubt that the Saints justifiably relied on the
arbitration agreement with Plaintiff; the Saints offered Plaintiff employment
in exchange for Plaintiff's agreement to arbitrate all disputes. Because
Plaintiff raises allegations of substantially interdependent and concerted
misconduct by the Bensons and the Saints, the Saints will be required to
participate in the proceeding in court, with resulting loss of time and money.
In addition, the arbitration proceedings between Plaintiff and the Saints will
be rendered meaningless if Plaintiff's claims against the Bensons are not sent
to arbitration. Thus, the Saints justifiably relied on Plaintiff's voluntary
conduct and changed its position to its detriment as a result of such reliance.
*See MB Indus., LLC*, 74 So. 3d at 1180.

under the doctrine of equitable estoppel, Plaintiff must submit his claims against the Bensons to arbitration as well. Accordingly, the Court will order that this matter be stayed and administratively closed pending arbitration.

## C.   Motion for Limited Discovery

Plaintiff filed the *Motion for Limited Discovery* **(Rec. Doc. 31)** seeking to discover information that Plaintiff claims is necessary to evaluate the Defendants' equitable estoppel argument. Specifically, Plaintiff seeks to conduct written discovery and depositions of Mr. and Mrs. Benson regarding their knowledge of the arbitration clause in the Agreement and any detrimental changes to their relevant positions. In response, Defendants contend that Plaintiff's proposed discovery should not be allowed because the Bensons' reliance on the arbitration agreement is not what controls the Court's analysis when considering equitable estoppel.

The Fifth Circuit has advised that when considering claims brought under the FAA, district courts are to conduct "an expeditious and summary hearing, with only restricted inquiry into factual issues" bearing on the making of the arbitration agreement. *Snap-on Tools Corp. v. Mason*, 18 F.3d 1261, 1265 n.4 (5th Cir. 1994) (quoting *Moses*, 460 U.S. at 22). It was "Congress's clear intent, in the [FAA], to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses*, 460 U.S. at 22. "Thus, courts have generally

35

denied arbitration-related discovery absent a compelling showing that such discovery is required." *Bell v. Koch Foods of Miss., LLC*, No. 08-697, 2009 WL 1259054, at *3 (S.D. Miss. May 5, 2009).

There is no compelling showing that Plaintiff's proposed discovery is required in the instant case. The discovery Plaintiff seeks is irrelevant to the issue of whether application of equitable estoppel is warranted. As discussed above, when considering whether a signatory plaintiff may be compelled to arbitrate his claims against a nonsignatory defendant, the relevant inquiry is whether a signatory to the arbitration agreement changes its position in justifiable reliance on some voluntary conduct by the plaintiff. *See In re Apple iPhone*, 864 F. Supp. 2d at 465. The detrimental reliance of the signatory warrants application of equitable estoppel. *See Grigson*, 210 F.3d at 528 ("[D]etrimental reliance by th[e] signatory *cannot* be denied . . . ."). Here, the Saints detrimentally relied on the existence of the arbitration agreement with Plaintiff. Thus, application of the doctrine of equitable estoppel is warranted. Any discovery aimed at the Bensons that seeks to delve into issues of their detrimental reliance is irrelevant and unnecessary. Accordingly, the Court will deny Plaintiff's motion for limited discovery.

<u>CONCLUSION</u>

**IT IS HEREBY ORDERED** that Defendants' *Motion to Compel Arbitration* **(Rec. Doc. 5)** and *Motion to Dismiss or, in the*

36

*Alternative, to Stay Action Pending Arbitration, and Motion to Compel Arbitration* **(Rec. Doc. 12)** are **GRANTED**. Plaintiff must submit his claims against Defendants to arbitration in accordance with the Agreement.

    **IT IS FURTHER ORDERED** that all proceedings in this matter shall be **STAYED** pending the outcome of the arbitration. The Clerk of Court shall mark this action administratively closed for statistical purposes.

    **IT IS FURTHER ORDERED** that Defendants' *Motion to Strike Declaration of Prof. Imre Stephen Szalai* **(Rec. Doc. 23)** is **GRANTED**.

    **IT IS FURTHER ORDERED** that Plaintiff's *Motion for Limited Discovery* **(Rec. Doc. 31)** is **DENIED**.

    **IT IS FURTHER ORDERED** that Plaintiff's *Motion for Leave to File Sur-Reply* **(Rec. Doc. 32)** is **DENIED as moot**.

    **IT IS FURTHER ORDERED** that Defendants' *Motion for Leave to File Supplemental Memorandum* **(Rec. Doc. 33)** is **DENIED as moot**.

    New Orleans, Louisiana, this 18th day of May, 2016.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE